Filed 9/18/14  FSH Services v. Dallenbach CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| FSH SERVICES, et al., | D063756 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2011-00059164-CU-BT-NC ) |
| DANIEL J. DALLENBACH, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Affirmed.

Marcia L. Brewer for Plaintiffs and Appellants FSH Services and David W. Swanson.

Joe Alfred Izen, Jr., in pro. per., for Plaintiff and Appellant Joe Alfred Izen, Jr.

Andersen Hilbert & Parker, John Forest Hilbert and Jason L. Satterly for Defendants and Respondents Daniel J. Dallenbach, Pacific Asset Capital, Inc. and Valley View Properties.

John J. McCabe, Jr. for Defendant and Respondent Janet Richardson.

FSH Services (FSH), David W. Swanson, and Joe Alfred Izen, Jr. (FSH, Swanson, and Izen collectively Appellants) brought suit against, among other entities, Daniel J. Dallenbach, Pacific Asset Capital, Inc., Valley View Properties, and Janet Richardson[1] (collectively Respondents) for aiding and abetting breach of fiduciary duty and an accounting. After a couple rounds of demurrers, Appellants filed a second amended complaint consisting of eight causes of action. Respondents demurred to that complaint, and the court sustained the demurrer without leave to amend. In doing so, the superior court found that all of Appellants' causes of action were barred by the applicable statutes of limitations.

Appellants appeal the ensuing judgment of dismissal, contending the superior court erred in determining that the statutes of limitations had run on their claims. We disagree. The operative complaint includes a demand letter dated May 10, 2007 indicating Appellants believed, at that time, Respondents had failed to make certain payments owed to them. Respondents' alleged failure to pay is the linchpin of all of Appellants' causes of action. The demand letter requested an accounting and threatened to bring suit for "breaches of duty and fraud." Appellants, however, did not file suit until more than four years after the May 10, 2007 letter. Accordingly, we agree with the superior court that the applicable statutes of limitations bar all of Appellants' claims. We therefore affirm.

---

[1] The operative complaint refers to Jane Richardson, but Richardson's respondent's brief makes clear that her actual first name is Janet. As such, we refer to Richardson by her actual first name.

2

FACTUAL AND PROCEDURAL HISTORY

An appellant's opening brief must provide a summary of significant facts limited to matters in the record. (Cal. Rules of Court, rule 8.204(2)(C); *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Here, Appellants certainly limited their facts to the record, but instead of providing this court with the salient facts necessary to review their appeal, they simply cut and paste the allegations from the operative complaint (complete with the same paragraph numbers and reference to attached exhibits). Such recitation is not particularly helpful to us or Appellants' position. The operative complaint is in the record. We can refer to it as needed. A more helpful presentation of the facts would highlight the important details critical to Appellants' case. By merely repeating many of the allegations of the operative complaint verbatim, Appellants leave us to scour through the allegations and determine what allegations truly are significant. A more effective opening brief will tell us what facts are momentous and why they are so. An opening brief that just repeats the allegations in the complaint can prove distracting.

Despite Appellants' failure to provide us with the cogent facts, we distill the key allegations below.

FSH is a California business trust. Swanson contracted with FSH to provide engineering services to FSH's customers and also created intellectual property that was sold to FSH's customers. FSH generated sales of over $1.5 million between 1993 and 1999. FSH acted as a liability shield for Swanson, who is a beneficiary of FSH.

3

Richard Evans is a former trustee of FSH. In his capacity as trustee, Evans began loaning money from FSH to Respondents[2] for use in real estate development deals, and then diverting the monies generated by those deals for his own personal benefit rather than FSH's benefit. The loans were secured by liens against the land in development.

Evans also was a trustee of another business trust called Belgoserve.

Despite Respondents' failure to repay these loans, Evans released FSH's liens against the development properties in exchange for a "secret personal ownership in the real estate developed with FSH monies through Belgoserve's ownership of 25% interest in California Tracts, L.L.C. and a 20% interest in Defendant, Speedy Development Corporation." Evans perpetrated this scheme for a number of years before being indicted, convicted and imprisoned by the federal government for tax-related activities involving other trusts for which he served as trustee. While Evans was being investigated, Izen, an attorney, represented Evans in connection with his tax problems with the Internal Revenue Service. To this end, FSH lent money to Evans for his legal fees, and as payment for Izen's services and FSH's loan, Izen and FSH accepted assignments from Evans of the distributions that would otherwise be payable to Belgoserve through Respondents' land development deals (the Assignments).

On July 7, 2006, shortly before Evans's incarceration, Mark Corcoran replaced Evans as the trustee for FSH because the criminal investigation was impacting Evans's

_____

[2]    Appellants allege that two of the entities that received funds from FSH are California Tracts, LLC, a Nevada limited liability corporation and Speedy Development Corporation, a California business corporation. Dallenbach was a manager of California Tracts. Neither California Tracts nor Speedy Development is a respondent in this matter.

4

ability to carry out his duties as trustee of FSH.  On October 4, 2006, per an order from the United States District Court for the Southern District of California, Evans was forced to officially resign as trustee.

Izen, on behalf of himself and FSH, sent a letter to Dallenbach dated May 10, 2007.  The letter's subject line read "Demand for Accounting and Payment on Assignment; Belgoserve, California Tracts LLC, and Speedy Development Inc. v. F.S.H. Services and Joe Alfred Izen Jr."  The letter stated, in pertinent part:

> "I have been greatly disturbed by your inaction in the face of a supposed closing of the sale of 10 homes developed or real estate in which both FSH and Joe Alfred Izen Jr. holds [sic] an assignment of any member benefits, including profit distributions.  These lots were sold in May of 2005 by California Tracts, LLC per your letter of January 4, 2007.

> "Research of the past history of these two projects establishes that 10 lots were purchased with FSH's loan proceeds which it advanced to your company's [sic] for pursuit of 'the project.'  The 10 lots were purchased for 80k a piece.  After improvements these lots have a market value of 300k a piece.  Thus, the purchase money for the lots was $800,000 while the market value is $3,000,000.

> "Purchase price and cost of development of these type [sic] of lots does not generally run over 50%.  At 2.2 million in profit there should have been over $1,000,000 available to pay FSH and Joe Alfred Izen Jr. on their assignments.

> [¶] . . . [¶]

> "Mr. Swanson informs me that you told him FSH and 'Izen' could only expect distributions of '$15,000 to $20,000 a piece' instead of the full amounts they are owed. . . .

> "Demand is hereby made for an accounting of both projects which will allow us to determine how the monies for the projects was [sic] spent and whether the expenses were a legitimate burden on the project that FSH and I took an interest in, by assignment, in order to

5

secure payment of a note and already earned attorney's fees. You should include all receipt and billings as well as gross sales figures so that we can confirm what was spent developing the projects in which we have an interest.

"This letter shall also serve as your notice that unless you comply with the above demand within twenty days, and prove to our satisfaction that your disposition of the monies and property was reasonable and called for by our outstanding agreements, suit will be filed against you, and any other persons responsible for any [of] the breaches of duty and fraud committed in these transactions and complaints will be made to the appropriate regulatory agency."

The letter copied Swanson.

Dallenbach responded in writing one day later. In his letter, he stated that he could not provide the accounting. In addition, Dallenbach claimed, "[t]o my knowledge, FSH has never loaned my company or me any money for anything." Dallenbach represented that "[a]ll monies held by Belgoserve will certainly be paid." The letter concludes with Dallenbach expressing dismay regarding the tenor of Izen's May 10 letter: "I'm truly surprised at the tone of your letter. . . . I would much prefer that we work together rather than as adversaries to solve these issues."

Almost a month later, Respondents' attorney sent Izen a letter dated June 25, 2007. In that letter, the attorney, among other things, stated that Dallenbach owed "no fiduciary duty to the other investors of California Tracts" and would not provide a "formal accounting." Respondents' attorney also took issue with the validity of any assignment from Evans to FSH and asked Izen to provide proof of his or FSH's interest in California Tracts. In addition, the attorney indicated that Dallenbach was considering bringing suit

6

"regarding an accounting of the books of and for California Tracts" but did not threaten to sue any of Appellants.

Speedy Development Corporation subsequently made two payments by check to Belgoserve, one in the amount of $2,261.02 and the other in the amount of $11,474.48 (the Belgoserve Payments). Dallenbach signed the checks, which were dated September 27, 2007. Apparently, Izen was able to negotiate these checks and deposit them in his account.

On October 11, 2007, Swanson was reviewing papers Evans instructed him to remove from a private storage locker and found a copy of a letter dated December 19, 2005. The letter was from Evans, as trustee, to FSH. In the letter, Evans writes that Belgoserve is a 25 percent member in California Tracts. In addition, the letter states that Belgoserve assigns to FSH its interest in the distribution from California Tracts "to the extent sufficient to cover the amount of $50,000.00." The letter clarified that "[t]his assignment is junior (2nd position) to a similar assignment to Attorney Joe A. Izen, Jr. in the amount of $65,000.00." To the extent that the distribution from California Tracts would be insufficient to cover the $115,000, Evans stated that "Belgoserve shall place the 25% stock position in its development corporation, Speedy Development Corporation, for the subdivision of approximately 48 lots in Hemet California as a security to cover any outstanding balance."

In addition to reviewing the December 19, 2005 letter, Swanson found a copy of California Tract's joint operating agreement.

7

On October 11, 2011, Appellants filed a complaint against Respondents, among other entities, that included only two causes of action: aiding and abetting breach of fiduciary duty and for an accounting. Respondents successfully demurred to the original complaint on the basis that the claims were barred by the applicable statutes of limitations. The superior court granted Appellants leave to amend.

Appellants filed a first amended complaint on June 18, 2012. This complaint included causes of action for aiding and abetting breach of fiduciary duty, for an accounting, fraudulent concealment, unfair business practices, breach of contract, and conversion. Respondents again successfully demurred to the complaint on the grounds that the claims were time-barred, but the court provided Appellants with leave to amend.

Appellants filed a second amended complaint on October 30, 2012, containing causes of action for an accounting, fraudulent concealment, unfair business practices, breach of contract, breach of the implied covenant of good faith and fair dealing, denuding of a corporation and limited liability company, and fraud. Respondents demurred to the operative complaint, again asserting all the claims were time-barred. The superior court agreed and sustained the demurrer without leave to amend. The court subsequently entered a judgment of dismissal.

Appellants timely appealed.

8

DISCUSSION

I

*STANDARD OF REVIEW*

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. We give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] Further, we treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law. [Citations.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action." (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.) "When reviewing a judgment dismissing a complaint after a successful demurrer, we assume the complaint's properly pleaded or implied factual allegations are true . . . ." (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320 (*Campbell*).)

"[W]hen [a demurrer] is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse." (*City of Dinuba v. County of Tulare*, *supra*, 41 Cal.4th at p. 865.) In reviewing the sustaining of a demurrer, we review the trial court's result for error, and not its legal reasoning. (*Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625, 631.)

Here, Appellants contend the court committed reversible error by sustaining Respondents' demurrer to the second amended complaint without leave to amend. They

9

assert the court incorrectly determined that the statute of limitations for each of the causes of action had expired. We are not persuaded.

II

*APPELLANTS' CAUSES OF ACTION ARE TIME-BARRED*

A. Applicable Law

Statutes of limitations " 'prescribe the periods beyond which' a plaintiff may not bring a cause of action. [Citation.]" (*Norgart v. Upjohn Company* (1999) 21 Cal.4th 383, 395 (*Norgart*).) The purpose of these statutes is to protect defendants from the claims of dilatory plaintiffs and to encourage plaintiffs to assert fresh claims against defendants in a diligent fashion. (*Ibid.*) "Under the statute of limitations, a plaintiff must bring a cause of action within the limitations period applicable thereto after accrual of the cause of action." (*Id.* at p. 397.)

"The general rule for defining the accrual of a cause of action sets the date as the time 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises.' " (*Norgart*, *supra*, 21 Cal.4th at p. 397.) "In other words, it sets the date as the time when the cause of action is complete with all of its elements." (*Ibid.*)

An important exception to the general rule for defining the accrual of a cause of action is the discovery rule. (*Norgart*, *supra*, 21 Cal.4th at p. 397.) The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Ibid.*) A plaintiff discovers a cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements. (*Ibid.*) The

10

plaintiff "has reason to suspect" when he has " ' " ' "notice or information of circumstances to put a reasonable person on inquiry . . . . " ' " ' " (*Id*. at p. 398, italics omitted.) The plaintiff need not know " 'specific "facts" necessary to establish' the cause of action; rather, he may seek to learn such facts through the 'process contemplated by pretrial discovery'; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place—he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go find' them himself if he can and 'file suit' if he does." (*Ibid*., fn. omitted.)

Where the facts are undisputed, the accrual of a cause of action may be determined as a matter of law. (*Thomas v. Canyon* (2011) 198 Cal.App.4th 594, 604.)

### B. Accrual of Appellants' Causes of Action

Appellants' causes of action all revolve around the Respondents' alleged failure to pay distributions to Appellants under the Assignments. Based on the allegations of the second amended complaint and the exhibits attached to it, it appears clear that Appellants were aware of this failure on May 10, 2007 when Izen sent the letter to Dallenbach. The letter was sent on behalf of Izen and FSH. It also copied Swanson.

In the May 10 letter, Izen made clear that he believed, based on his "[r]esearch of the past history" of the projects, Respondents were sitting on over $1 million from which to pay Appellants their distribution per the Assignments.[3] In addition, Izen demanded an

---

[3] We note that throughout the operative complaint and the opening brief, Appellants refer to multiple assignments. They allege the existence of the assignments, but do not include copies of multiple written assignments as part of their operative complaint or

11

accounting and threatened to bring suit for "breaches of duty and fraud" if he did not receive an accounting within 20 days justifying California Tract's failure to pay under the Assignments. And Izen took issue with Respondents' alleged position that he and FSH would only receive distributions of " '$15,000 to $20,000 a piece' instead of the full amounts they are owed." Therefore, the May 10 letter makes clear that Appellants believed Respondents had not paid them the required disbursements and disagreed regarding the amount Respondents had indicated would be paid. In other words, at the time of the May 10, 2007 letter, Appellants were aware that Respondents' actions had injured them. (See *Norgart*, *supra*, 21 Cal.4th at p. 397.) Respondents had not paid Appellants anything under the Assignments and the letter highlighted a disagreement between the parties regarding the amount to be paid, if any.

The schism between the parties was only further amplified by the June 25, 2007 letter sent to Izen by Respondents' attorney. In that letter, Respondents make clear that they will not provide Appellants with the demanded accounting. More importantly, the letter indicates that, at that time, Respondents questioned the validity of any interest

---

explain the relevant terms of these assignments. Instead, they attach the December 19, 2005 letter from Evans to FSH as an exhibit to the operative complaint. The letter purportedly memorializes the assignment to FSH and Izen of Belgoserve's interest in California Tracts and Speedy Development (if necessary) up to $50,000 to FSH and $65,000 to Izen. No other written assignments are part of the record before us. And in the only written assignment in the record, Appellants would be owed, at most, a total of $115,000. This amount is far less from the $1 million Appellants claim Respondents possessed on May 10, 2007 from which to pay FSH and Izen "on their assignments." Although Appellants did not demand a certain amount in their letter, their reference to $1 million as well as their discussion of the real estate deals and multiple assignments strongly suggest that Appellants believed they were owed significantly more than the $115,000 set forth in the December 19 letter.

12

Appellants claim they had in California Tracts.  As such, Respondents' position in the June 25 letter reveals they do not agree that any money is owed to Appellants.  Thus, after the June 25, 2007 letter, Appellants should have had no doubt that Respondents did not intend to provide either an accounting or make payments in the amount that Appellants believed they were owed (if Respondents were going to make any payments).

In their reply brief, Appellants contend none of their causes of action could accrue until they knew the precise amount that was owed under the Assignments.  Thus, under Appellants' argument, none of their causes of action could accrue until Respondents and Appellants agreed on the amount owed or Respondents produced an accurate accounting.  However, Appellants provide no authority to support this contention.  Indeed, they do not discuss the elements of any of their claims or show that the claims require a plaintiff to have knowledge of the exact amount of damages owed.  Our independent research has uncovered none.  Instead, case law explains a "cause of action accrues for purposes of the statute of limitations, and the applicable limitations period begins to run, when the plaintiff has suffered damages from a wrongful act."  (*Lyles v. State of California* (2007) 153 Cal.App.4th 281, 286.)  " 'Although a right to recover nominal damages will not trigger the running of the period of limitation, the infliction of appreciable and actual harm, however uncertain in amount, will commence the statutory period. . . .  [N]either uncertainty as to the amount of damages nor difficulty in proving damages tolls the period of limitations.' "  (*Engstrom v. Kallins* (1996) 49 Cal.App.4th 773, 783; see *Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 640.)  Therefore, there is no requirement that Appellants know the amount of damages before their causes of action

accrue. Here, Appellants threaten to bring suit against Respondents in the May 10, 2007 letter. At that point, Appellants believed they had been injured. The fact they did not know the precise amount of their claimed damages did not delay the accrual of their causes of action or otherwise toll the applicable statutes of limitations. (*Engstrom*, *supra*, at p. 783.)

In addition, the only written assignment in the record appears to cap Izen's interest at $65,000 and FSH's interest at $50,000. Thus, it is unclear, on the record before us, on what basis Appellants would be entitled to additional disbursements or why they did not know the amount owed at the time they sent the May 10, 2007 letter.[4]

C. Each Cause of Action is Barred Under the Relevant Statute of Limitations

Appellants included eight causes of action in their second amended complaint. In their opening brief, Appellants do not discuss the elements of any of the causes of action. Such a discussion might have proved helpful because it could have linked the elements with certain facts in the complaint to better explain Appellants' position regarding when each cause of action accrued.[5] However, they did not do so, but instead, focus almost exclusively on the applicable statute of limitations for each cause of action. Although the Appellants eschew a detailed discussion of the elements linked to the allegations in the

---

[4]    In the second amended complaint, Appellants allege damages in the amount of $680,000.

[5]    Also, Appellants could have benefited by explaining how they stated a valid cause of action for fraudulent concealment when they neglected to plead all the required elements. (See *Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1130.)

14

complaint, it is apparent that all the causes of action arise out of the same harm: Respondents' failure to pay Appellants what they believe they are owed under the Assignments.

Although Appellants' causes of action have different statutes of limitations, the longest limitations period is four years.  (See e.g., Code Civ. Proc., § 337, subd. 1 [breach of written contract].)  Here, based on the allegations in the second amended complaint and the exhibits attached to it, it is clear Appellants were aware they had been harmed no later than May 10, 2007 when Izen sent his demand letter.  In addition, any claim they might have that they were not sure they were harmed was disabused by Respondents' attorney's June 25, 2007 letter.  Nevertheless, Appellants did not file their original complaint until October 11, 2011, well beyond the longest statute of limitations that could apply to any of the subject causes of action.  Thus, Appellants' filing of the original complaint was untimely and all causes of action are time-barred.[6]

Appellants, however, argue in their reply brief that there was no time of performance in the Assignments.  Putting aside the fact that Appellants failed to plead the terms of the various assignments, but only attached a letter purporting to be an

---

[6]     Appellants admit that their cause of action for denuding a corporation and limited liability company is only an extended claim of relief.  They argue they are entitled to such relief if Respondents "liquidated the assets of the entities they operated without making provision for payment of the entities' just debts."  Putting aside whether such a cause of action can be properly pled here, this relief, however, would only be available if Appellants successfully brought suit to recover for the alleged failed payments under the Assignments.  As we discuss, Appellants were aware of the failed payments no later than May 10, 2007.  Because their claims for these payments are barred by the applicable statutes of limitations, it logically follows that Appellants would not be entitled to the extended relief they seek under their denuding cause of action.

15

assignment from Evans to Izen and FSH for the total amount of $115,000, Appellants again ignore the language in the May 10, 2007 demand letter. In the letter, Izen states he is "greatly disturbed" by Respondents' "inaction" after the closing of the sale of 10 homes in May 2005. Izen accuses Respondents of unreasonable "disposition of the monies and property" from which Appellants were allegedly entitled to some distribution. He also threatens to sue Respondents if they do not provide an accounting supporting their disposition of the money and property. In short, the May 10, 2007 demand letter emphasizes that Appellants believe they have been owed money since May 2005 and are going to bring suit if they are not paid soon or receive a sufficient explanation why no money has been paid. Appellants' argument, made some seven years after the May 10 demand letter, that the Assignments do not contain a specific time of performance so their causes of action did not accrue or the relevant statutes of limitations did not run is unavailing.

### D. The Facts Alleged in the Second Amended Complaint Do Not Save Appellants' Claims

Appellants argue their causes of action are not time-barred for two reasons. First, they claim that Respondents fraudulently concealed facts giving rise to Appellants' causes of action. Second, Appellants contend the causes of action could not accrue until a "reasonable time" following Respondents' failure to pay Appellants the total amount owed after Respondents made a "partial payment" to Belgoserve on September 27, 2007. We reject these contentions.

16

*1. Fraudulent Concealment*

"The doctrine of fraudulent concealment, which is judicially created [citations], limits the typical statute of limitations. '[T]he defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations. . . .' [Citations.] In articulating the doctrine, the courts have had as their purpose to disarm a defendant who, by his own deception, has caused a claim to become stale and a plaintiff dilatory." (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 533.)

However, fraudulent concealment " 'does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim.' " (*Rita M. v. Roman Catholic Archbishop* (1986) 187 Cal.App.3d 1453, 1460.) A plaintiff is under a duty to reasonably investigate, and a suspicion of wrongdoing, coupled with a knowledge of the harm and its cause, commences the limitations period. (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112.)

Here, Appellants claim the June 25, 2007 letter from Respondents' counsel contained "lies and misrepresentations . . . [that] constituted fraudulent concealment[,] which was calculated to prevent, and did prevent, [Appellants] discovery of their cause(s) of action and hindered [Appellants'] efforts to discovery [sic] their causes of action." Yet, Appellants ignore their May 10, 2007 demand letter. That demand letter elucidates that they believed, at that time, Respondents owed Appellants a substantial amount of money under the Assignments. The May 10 letter also highlights a disagreement between the parties regarding the amount owed. According to Izen, Dawson told one of the Appellants that Izen and FSH were entitled to no more than $20,000. Finally,

17

Appellants state that they will sue Respondents for "the breaches of duty and fraud" if their demands were not met. Therefore, the May 10 letter underscores that there is a dispute regarding the amount Appellants are owed under the Assignments. Put differently, by May 10, 2007, Appellants are on notice of potential claims against Respondents and even threaten to sue Respondents based on these claims. Taking Izen at his word, we struggle to contemplate how Respondents could fraudulently conceal the existence of Appellants' claims against Respondents. Appellants knew about the potential claims and warn Respondents that they will sue.

Further, we disagree with Appellants' characterization of the June 25, 2007 letter. Appellants contend Respondents lied in that letter, which required Appellants to further investigate their potential claims. However, the May 10 letter clearly stated payments were owed. The June 25 letter disputed the existence of any basis for the claimed payments. As such, the June 25 letter contained mere litigation posturing, in response to the threat of litigation. It denied Respondents owed Appellants any money. It did not conceal any facts.

In short, assuming the allegations in both the May 10 letter and the second amended complaint are true, we conclude Appellants were aware of their potential claims against Respondents as early as May 10, 2007. The fact that Appellants did not know the precise claims they would later assert is of no moment. (See *Lyles v. State of California*, *supra*, 153 Cal.App.4th at p. 286.) They knew they had been harmed and forewarned Respondents they would sue. As such, the doctrine of fraudulent concealment is not

18

applicable. (See *Rita M. v. Roman Catholic Archbishop*, *supra*, 187 Cal.App.3d at p. 1460.)

## 2. *Partial Payment*

Appellants also argue two payments from Speedy Development to Belgoserve totaling $13,735.50 made on September 27, 2007 save their claims from being time-barred. We are not persuaded.

As a threshold matter, the allegations of the second amended complaint and the actual checks are not in agreement. In the second amended complaint, Appellants allege that Respondents made a payment to Izen that was "represented to be a portion of the $65,000 owed to Izen under the assignment." However, the checks, which are attached to the operative complaint as an exhibit, are made payable to Belgoserve. Nevertheless, Appellants allege that Izen negotiated the checks and deposited them in his account. An exhibit to the second amended complaint supports this allegation, but Appellants fail to explain how Izen was able to negotiate the checks that were made payable to Belgoserve. We make this observation to underscore there are scant facts alleged in the operative complaint that support Appellants' assertion that these two payments to Belgoserve were actually "partial payments" that led Appellants to believe that Respondents would be making additional payments.

Even if we assume that the two checks were payments made to Appellants, we find nothing in the second amended complaint that supports Appellants' conclusion that Respondents intended these two checks to be a partial payment of some larger amount owed to Appellants under the Assignments. In the May 10, 2007 letter, Izen makes clear

19

that he disagrees with an assertion he attributes to Dallenbach: "Mr. Swanson informs me that you told him FSH and 'Izen' could only expect distributions of '$15,000 to $20,000 a piece' instead of the full amounts they are owed." Thus, the two payments made in September 2007 were consistent with Dallenbach's position as described by Izen in his May 10 letter. There are no allegations in the operative complaint or any exhibit attached to that complaint that explains why Appellants would receive the payments totaling $13,735.50 and reasonably believe that Respondents were going to pay the total amount Appellants claim they are owed. The unreasonableness of that position and the lack of any factual support for it are highlighted by Izen's claim in his letter that he and FSH are entitled to distributions under the Assignments and Respondents possessed $1 million earned from the various real estate projects from which to pay the distributions. This claim suggests Appellants believed they were entitled to significant sums, far beyond the $15,000 to $20,000 Respondents allegedly said would be paid. As such, we find no support for Appellants' conclusion that the Belgoserve payments were partial payments that somehow tolled the statute of limitations here.

Appellants argue that both *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947 (*McCaskey*) and *Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331 (*Galdjie*) support their position that the statute of limitations did not begin to run until a "reasonable time" after they received the "partial payment." Appellants' reliance on these cases is misplaced.

Here, Appellants sent a demand letter to Respondents on May 10, 2007 requesting an accounting. At that point, Appellants believed they were owed a considerable sum of

20

money under the Assignments and referenced that it could be paid from the $1 million Respondents had earned on the real estate projects. If they did not receive an accounting within 20 days of the date of the letter, Appellants threatened to sue for "breaches of duty and fraud." Thus, the letter makes clear that, unless Respondents could prove to Appellants' satisfaction that only $15,000 to $20,000 was owed under the Assignments, Appellants would sue. Further, it gave Respondents a deadline by which to provide an accounting. Put differently, Appellants believed they were injured and were prepared to bring suit on May 10, 2007. Neither *McCaskey*, *supra*, 189 Cal.App.4th 947 nor *Galdjie*, *supra*, 113 Cal.App.4th 1331 involve facts similar to the instant matter.

In *McCaskey*, *supra*, 189 Cal.App.4th 947, at issue was the defendant's promise that it would not terminate certain employees for failing to meet their full sales quotas. (*Id*. at p. 958.) Although the defendant did not include any reduction in the sales quota in its new compensation plan, the court noted that the defendant could not be considered in breach until it terminated an employee who failed to meet his or her full sales quota and not the promised, reduced quota. (*Ibid*.) Thus, the statute of limitations on the plaintiffs' breach of contract claim did not begin to run, as the defendant urged, when the defendant released its new compensation plan that omitted the reduced quotas. The court further observed: "[T]o pinpoint the time of an alleged breach for purposes of the statute of limitations, it is necessary to establish what it was the defendant promised to do, or refrain from doing, and when its conduct diverged from that promise." (*Ibid.*, italics omitted.)

Here, Appellants argue that the June 25, 2007 letter from Respondents' counsel is analogous to the defendant's new compensation plan in *McCaskey*, *supra*, 189 Cal.App.4th 947. Appellants therefore maintain the June 25, 2007 letter was an anticipatory breach of the Assignments and that the actual breach did not occur until a reasonable time after the partial payment. In making this argument, Appellants ignore their May 10, 2007 demand letter. In that letter, Izen claimed that "profit distributions" from certain lots that were sold in May 2005 were owed to him and FSH. In other words, Respondents already owed Appellants the distributions. There was no date in the future by which Respondents were to pay. Further, Izen threatened litigation in his demand letter. Nevertheless, Appellants waited four and a half years after Izen's letter to bring suit. In contrast, the plaintiffs moved quickly in *McCaskey*, *supra*, 189 Cal.App.4th 947. "When [the defendant] finally discharged [McCaskey] in flat violation of the policy, followed shortly by the discharge of [other employees] for refusing to accede to its abolition, plaintiffs moved with alacrity to seek administrative and then judicial relief." (*Id*. at p. 959.)

Like *McCaskey, supra,* 189 Cal.App.4th 947, *Galdjie*, *supra*, 113 Cal.App.4th 1331 does not help Appellants. *Galdjie*, in part, concerned whether the failure of either party to perform as required on the scheduled closing date automatically discharged the parties' agreement regarding the purchase of certain real property. (*Id*. at p. 1337.) Here, there are no facts even remotely similar to the facts before the court in *Galdjie*. There is no purchase agreement. Appellants have not indicated a time by which the parties were required to perform any condition under the Assignments. Again, Appellants ignore the

22

May 10 demand letter in making their argument. The demand letter illuminates that Appellants believed at the time of that letter Respondents owed them a sizable disbursement under the Assignments.

## E. Conclusion

This case underscores the impact of a demand letter. Here, the May 10, 2007 letter left no doubt that Appellants believed they had been harmed by Respondents' actions. Appellants thus demanded Respondents provide an accounting by a certain time or they would bring suit, based on Respondents' failure to pay them under the Assignments. For reasons not entirely clear in the record, Appellants waited well over four years after their demand letter to bring suit. And the basis of their suit, Respondents' failure to pay under the Assignments, did not change during that time. Here, Appellants have attempted to obscure the contents of the May 10, 2007 letter, but their own words undermine their primary argument before us that the applicable statutes of limitations had not run on their causes of action. We therefore conclude all of their claims are time-barred.[7]

---

[7] Because we determine that all claims are time-barred, even those with a four-year statute of limitations, we need not address Appellants' argument that Texas law applies to the fraud cause of action. Under Texas law, a fraud cause of action enjoys a four-year statute of limitations (see Texas Civ. Prac. & Rem. Code, § 16.004, subd. (a)(4)) while in California, that claim has a three-year statute of limitations (see Code Civ. Proc., § 338, subd. (d)).

DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on this appeal.

 

 

 

_____

HUFFMAN, J.

WE CONCUR:


_____

McCONNELL, P. J.


_____

NARES, J.